

# In the Missouri Court of Appeals
# Eastern District

## DIVISION ONE

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | No. ED106820 |
| | ) | |
| Respondent, | ) | Appeal from the Circuit Court |
| | ) | of St. Charles County |
| vs. | ) | |
| | ) | Honorable Jon A. Cunningham |
| ALBERT WELCH, | ) | |
| | ) | |
| Appellant. | ) | FILED: February 11, 2020 |

Albert Welch ("Appellant") appeals from the trial court's judgment convicting him of: assault in the first degree, in violation of Section 565.050, RSMo 1984 (Count I); armed criminal action, in violation of Section 571.015, RSMo 1979 (Count II); unlawful use of a weapon, in violation of Section 571.030, RSMo Cum. Supp. 2014 (Count III); two counts of endangering the welfare of a child in the first degree, in violation of Section 568.045, RSMo Cum. Supp. 2009 (Counts V and VI); domestic assault in the third degree, in violation of Section 565.074, RSMo Cum. Supp. 2012 (Count VII); and five counts of endangering the welfare of a child in the second degree, in violation of Section 568.050, RSMo Cum. Supp. 2005 (Counts X-XIV). Appellant was sentenced to 12 years in the Department of Corrections ("DOC") on Count I, four years in the DOC on Count II, four years in the DOC on Count III, five years in the DOC on Counts V and VI, six months in the St. Charles County Jail on Counts VII and X through XIV. All counts were to run concurrently with each other except for Count II, which runs consecutively to Count I. We reverse and remand for a new trial on Counts I and II.

# I. Background

Appellant lived in a mobile home with a woman ("Girlfriend"), whom he had not officially married but had lived with for 12 or 13 years and referred to at times as his wife. They also lived with eight children, who ranged from age six to 20, and two of the children referred to Appellant as their stepfather.

On the night in question, Appellant returned home from work with a friend, Lawrence Cunningham, also known as "Red" (referred to hereafter as "Red"). They drank whiskey and Appellant became drunk. Girlfriend also drank with them. Appellant told the children to go to their bedrooms, which they did. Appellant then asked Red and Girlfriend to have sex in front of him, but they told Appellant they did not want to do that. Appellant had asked Red and Girlfriend more than ten times in the past to have sex in front of him, but they never had. Appellant also had told Red that he "had a friend in Florida that they did it with and there wasn't nothing wrong with it." Appellant was pressing the issue more than usual and became angry when they refused. Red and Girlfriend ultimately had sex in the living room while Appellant watched. Red then went to the bathroom to take a shower and Appellant told Girlfriend to get into the shower with Red. She refused and Appellant grabbed his revolver from the top of the refrigerator and told Girlfriend that he would shoot her if she didn't get into the shower with Red. Girlfriend complied, although she and Red did not engage in sexual activity.

Less than five minutes later, Girlfriend left the shower, grabbed a towel and headed for the laundry room for some clothes. Appellant was sitting on a recliner in the living room, still holding the gun. Appellant began screaming at Girlfriend, calling her names, and asking her why she got in the shower with Red. Girlfriend testified that Appellant did not remember having told her to get in the shower with Red because he was intoxicated. Appellant followed Girlfriend to the laundry room, while continuing to yell at her and wave the gun around. He pointed the

2

gun at her chest and yelled that he was going to kill her. Girlfriend screamed at him to please stop and not to kill her.

One of the children, M.R., heard his mother and ran into the living room and saw Appellant pointing the gun, so M.R. yelled at Appellant to stop. Appellant walked toward M.R. and into the living room, then fired a shot into the ceiling of the living room. Appellant also pointed the gun at M.R.'s chest while two other children, A.R. and J.R., were standing beside M.R. M.R. and J.R. ran back down the hallway toward their rooms, and A.R. quickly ran out of the front door to a neighbor's house where he asked them to call 911. J.R. sat on his bed, shaking with fear. Red heard the screaming and peeked his head out of the bathroom, after which Appellant walked down the hallway and into the bathroom.

Appellant told Red he was going to kill him and fired a shot into the shower wall as Red pushed the gun away from his head. Appellant and Red scuffled in the bathroom as Red tried to move Appellant's hand with the gun away from his head and avoid getting shot. Red asked Appellant what he was doing and told him that he was his best friend and he loved him. Appellant fired two more shots that went into J.R. and A.R.'s room, which was next to the bathroom. Appellant continued to pull the trigger when there were no more live rounds to fire, just making a clicking noise. J.R. heard Appellant and Red banging against the walls as they screamed at each other, as well as the three gunshots. Girlfriend also heard three gunshots, glass breaking, and Red telling Appellant to stop. Girlfriend hid in the laundry room. Red then ran out of the trailer.

When Appellant walked past J.R. and A.R.'s bedroom, he asked where A.R. was and yelled at J.R. to go get him. Appellant asked Girlfriend to hide the gun before leaving the trailer shortly thereafter. The revolver, containing six spent shell casings, was later recovered from the closet of the children's bedroom.

3

After Appellant left, Girlfriend checked on the five youngest children and found that they were all crying. They had heard the loud gunshots and Appellant yelling. Three children testified that hearing the gunshots made them scared. Girlfriend then went to J.R. and A.R.'s bedroom and found that A.R. was not there. The police arrived within ten minutes after Appellant had left.

The mirror in the bathroom was broken, and three bullet holes were discovered there: one in the shower, one above the mirror, and one in the cabinet above the toilet. Two of the bullets went through the bathroom wall and into J.R. and A.R.'s bedroom. One of those bullets entered the bedroom within inches of the television and exited above the top bunk of the nearby bunk bed, which was A.R.'s bed. That bullet then entered the living room through a picture on the wall, before exiting through the ceiling.

Following Appellant's arrest, he told his sister to tell Girlfriend that he did not want her to go to court, talk to the prosecutors, or reveal anything that had happened. He was charged with the class B felony of assault in the first degree for attempting to kill or cause serious physical injury to Red by shooting at him (Count I); the unclassified felony of armed criminal action for committing the assault in Count I with a deadly weapon (Count II); the class D felony of unlawful use of a weapon (Count III); the class B felony of burglary in the first degree (Count IV); the class C felony of endangering the welfare of a child in the first degree (Counts V-VI and Counts X-XIV), for knowingly acting in a manner that created a substantial risk to the life, body, or health of J.R., A.R., S.W., M.W., A.W., T.W. and W.W., children less than seventeen years of age, by shooting a firearm in the home in which the children were located; the class A misdemeanor of domestic assault in the third degree (Count VII), for purposely placing M.R. in apprehension of immediate physical injury by screaming at him and shooting a firearm; the class B felony of assault in the first degree (Count VIII), for attempting to kill or cause serious

4

physical injury to M.R. by pointing a loaded firearm at him and walking toward him; the unclassified felony of armed criminal action (Count IX), for committing the assault in Count VIII with a deadly weapon; and the class C felony of tampering with a witness (Count XV). Appellant did not testify or present any evidence on his behalf.

The jury found Appellant guilty on Counts I, II, III, V, VI, VII, X, XI, XII, XIII, and XIV; the jury found him not guilty on Counts VIII (assault in the first degree), IX (armed criminal action), and XV (tampering with the witness). The State dismissed Count IV (burglary in the first degree) before the start of trial. Appellant was sentenced to twelve years in the Department of Corrections on Count I, four years on Count II, four years on Count III, five years on Counts V and VI, six months in the St. Charles County Jail on Counts VII and X through XIV. All sentences were to run concurrently with each other except on Count II, which runs consecutively to Count I. This appeal follows.

## II. Discussion

Appellant raises five points on appeal. First he alleges the trial court plainly erred in submitting Instruction No. 9 to the jury, because the verdict director failed to specify a particular incident of assault in the first degree and thereby violated Appellant's rights to due process, a fair trial, and a unanimous verdict, as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Sections 10, 18(a), and 22(a) of the Missouri Constitution. Appellant alleges the State presented evidence of multiple, distinct acts of assault in the first degree, yet the verdict director did not specify any one of these incidents, thereby making it unclear as to which incident Appellant was found guilty and allowing the possibility that the jurors failed to find the same incident of assault in the first degree unanimously.

Appellant's second point alleges the trial court erred in refusing to instruct the jury on second-degree assault based on sudden passion as to Count I, because that offense is a lesser-

5

included offense of first-degree assault, and failing to so instruct the jury violated Section 556.046 and Appellant's right to due process, as guaranteed by the Fourteenth Amendment to the United States Constitution. Appellant contends there was a basis in the evidence for an acquittal of the higher offense and a conviction only on the lesser offense since the jury could have found that Appellant assaulted Red under the influence of sudden passion.

Third, Appellant alleges the trial court erred in denying the motion for judgment of acquittal at the close of the State's evidence and the close of all the evidence, denying the motion for new trial, and in imposing sentence on Appellant for Count VI, endangering the welfare of a child in the first degree, because those actions denied Appellant his right to due process, under the Fourteenth Amendment of the U.S. Constitution and Article I, Section 10 of the Missouri Constitution. Appellant argues the evidence did not prove beyond a reasonable doubt that his actions created a substantial risk to the life, body, or health of A.R.

Fourth, Appellant claims the trial court erred in denying the motion for judgment of acquittal at the close of the State's evidence and the close of all the evidence, denying the motion for new trial, and in imposing sentence on Appellant for Counts X, XI, XII, XIII, and XIV, endangering the welfare of a child in the second degree, because those actions denied Appellant his right to due process under the Fourteenth Amendment of the U.S. Constitution and Article I, Section 10 of the Missouri Constitution. Appellant argues the evidence did not prove beyond a reasonable doubt that Appellant's actions created a substantial risk to the life, body, or health of S.W., M.W., A.W., T.W., and W.W.

Fifth, Appellant alleges the trial court abused its discretion in allowing Sully, a comfort dog of the St. Charles Prosecutor's Office, to accompany T.W. and W.W. to the witness stand, because the trial court was without statutory authority to allow this and this action violated Section 491.725 and Appellant's right to a fair trial and due process, in violation of the Sixth and

6

Fourteenth Amendments to the U.S. Constitution and Article I, Sections 10 and 18(a) of the Missouri Constitution. Appellant claims that Section 491.725 does not authorize a child witness to be accompanied by a dog and the presence of a "comfort dog" created the impression to the jury that W.W. and T.W. had been traumatized by Appellant's alleged actions.

Sixth and finally, Appellant alleges the trial court plainly erred in submitting Instructions No. 37, 41, 45, 49, and 53 to the jury, because the verdict directors failed to specify a particular incident of endangering the welfare of a child in the second degree as to five of the children and thereby violated Appellant's rights to due process, a fair trial, and a unanimous verdict, as guaranteed by the Sixth and Fourteenth Amendments to the U.S. Constitution and Article I, Sections 10, 18(a), and 22(a) of the Missouri Constitution. Appellant claims the State presented evidence of multiple acts of shooting a firearm in the home the children were located, yet the verdict director did not specify any one of these incidents, thereby making it unclear as to which incident Appellant was found guilty and allowing the possibility that the jurors failed to find the children were endangered by the same shot unanimously.

## Point II:  First and Second Degree Assault

We begin by addressing Appellant's second point, which argues the trial court erred in refusing to instruct the jury on second-degree assault based on sudden passion as to Count I, because that offense is a lesser-included offense of first-degree assault. Appellant argues there was a basis in the evidence for an acquittal of the higher offense and a conviction only on the lesser offense since the jury could have found that Appellant assaulted Red under the influence of sudden passion.

The State concedes that the trial court erred in finding insufficient evidence to support an instruction as to the potential mitigating defense of acting under the influence of sudden passion arising from an adequate cause, but contends the court's failure did not prejudice Appellant. The

State argues that Appellant's actions after the assault demonstrated his consciousness of guilt and were therefore inconsistent with a jury's finding that he had acted under the influence of sudden passion arising out of adequate cause.

After a review of the record, we find the evidence and law support an instruction on second-degree assault based on sudden passion.

A. Preservation of Error

To preserve a claim of instructional error, a defendant must make a specific objection to the instruction and the grounds of the objection; the same objection must be renewed in the motion for a new trial. Rule 70.03; State v. Weaver, 475 S.W.3d 695, 697 (Mo App. E.D. 2015). Appellant submitted proposed instruction, 9A, and argued there was evidence that he acted with sudden passion. The trial court refused the instruction, stating there was no evidence to support the argument that Appellant acted with sudden passion arising from adequate cause. After extra time was granted to him, Appellant timely filed the motion for new trial on April 11, 2018, addressing the same error. Thus, the issue is preserved.

B. Standard of Review

The standard of review for a court's refusal to give a proffered instruction pursuant to Section 556.046 is *de novo*, meaning this Court evaluates whether the instruction was supported by the evidence and the law. SKMDV Holdings, Inc. v. Green Jacobson, P.C., 494 S.W.3d 537, 545 (Mo. App. E.D. 2016). "[I]f the statutory requirements for giving such an instruction are met, a failure to give a requested instruction is reversible error." State v. Jackson, 433 S.W.3d 390, 399 (Mo. banc 2014). We will reverse only if the error resulted in prejudice and materially affected the merits of the action. Hervey v. Missouri Dept. of Corrections, 379 S.W.3d 156, 159 (Mo. banc 2012). "[P]rejudice is presumed when a trial court fails to give a requested lesser included offense instruction that is supported by the evidence." Jackson, 433 S.W.3d at 395 n.4.

8

"In determining whether a trial court erred in refusing to submit an instruction on a lesser-included offense, the evidence is viewed in the light most favorable to the defendant." State v. Stidman, 259 S.W.3d 96, 101 (Mo. App. S.D. 2008).

C. Analysis

Section 556.046(1) defines a lesser-included offense as one "established by proof of the same or less than all the facts required to establish the commission of the offense charged. Missouri law requires instruction on a lesser included offense when (1) "a party timely requests the instruction;" (2) "there is a basis in the evidence for acquitting the defendant of the charged offense;" and (3) "there is a basis in the evidence for convicting the defendant of the lesser included offense for which the instruction is requested." State v. Smith, 522 S.W.3d 221, 225 (Mo. banc 2017) (quoting State v. Jackson, 433 S.W.3d 390, 396 (Mo. banc 2014)). "Doubts concerning whether to instruct on a lesser included offense should be resolved in favor of including the instruction, leaving it to the jury to decide." Jackson, 433 S.W.3d at 399 (internal quotation omitted).

Section 565.050.1, in pertinent part, defines first-degree assault as knowingly causing or attempting to cause serious physical injury to another person. Section 565.060.1(1) defines second-degree assault as knowingly causing or attempting to cause serious physical injury to another person under the influence of sudden passion arising out of adequate cause. Thus, the only difference between assault in the first degree as charged and assault in the second degree as requested by Appellant was whether Appellant acted "under the influence of sudden passion arising out of adequate cause." Appellant had the burden of injecting the issue of influence of sudden passion arising from adequate cause. Section 565.060.2; State v. Redmond, 937 S.W.2d 205, 208 (Mo. banc 1996). Further, the issue is not submitted to the jury unless it is supported by the evidence. Id.

9

Although second-degree assault based on sudden passion is a lesser-included offense of first-degree assault, it is not a "nested" lesser-included offense. State v. Davis, 474 S.W.3d 179, 187 (Mo. App. E.D. 2015). Second-degree assault based on sudden passion is not a subset of the elements of first-degree assault and it is not "impossible to commit" the higher offense without necessarily committing the lower offense. Id.; see also Randle, 465 S.W.3d at 479. Second-degree assault includes an additional element not present in the greater offense, specifically the presence of sudden passion arising from adequate cause. See State v. Prince, 928 S.W.2d 429, 431 (Mo. App. W.D. 1996) (sudden passion arising from adequate cause is an element of the crime, requiring a jury finding). Nor are the offenses separated by "one differential element for which the [S]tate bears the burden of proof." See Randle, 465 S.W.3d at 479. It is the defendant who has the burden of injecting the issue of sudden passion and there must be evidence supporting the element before the issue will be submitted to the jury. Davis, 474 S.W.3d at 187. After the defendant has properly injected the issue, the State then has the burden of disproving the issue. Id.

"Sudden passion is an unexpected force, motivated by *another's provocation*, that subdues the prior mental state momentarily in causing a responsive act." State v. Hahn, 37 S.W.3d 344, 351 (Mo. App. W.D. 2000) (emphasis added). "[A] jury may not consider [voluntary] intoxication on the issue of the defendant's mental state." State v. Erwin, 848 S.W.2d 476, 482 (Mo. banc 1993). Although the evidence of Appellant's drunken state of mind was caused by Appellant's own actions and not motivated by another's provocation, the evidence of his long-time girlfriend, the mother of his children, having sex and/or showering with his friend Red was evidence sufficient to stir up that "unexpected force, motivated by another's provocation that subdues the prior mental state momentarily in causing a responsive act" here. The trial court erred in refusing to instruct the jury on Appellant's proffered instruction of

10

second-degree assault based on sudden passion – not because it was a "nested" lesser-included offense of first-degree assault, but because it was supported by the evidence presented at trial. The jury had the right to disbelieve any part of the evidence, such as the evidence that Appellant told Girlfriend and Red to have sex and shower together, as a sufficient basis in the evidence to justify giving the lesser-included offense instruction.

The underlying rationale for reversal is that failure to provide the jury with the option of a lesser-included offense deprives the defendant of a fair trial, even if the jury ultimately convicts the defendant of the greater offense. See McNeal v. State, 412 S.W.3d 886, 892 (Mo. banc 2013). When "one of the elements of the offense charged remains in doubt, but the defendant is plainly guilty of some offense, the jury is likely to resolve its doubts in favor of conviction." Id. (internal citations omitted). Even though juries are obligated "as a theoretical matter" to acquit a defendant if they do not find every element of the offense beyond a reasonable doubt, there is a "substantial risk that the jury's practice will diverge from theory" when it is not presented with the option of convicting of a lesser offense instead of acquittal." Id. Therefore, the jury's decision here to convict Appellant of the greater offense of first-degree assault does not foreclose all possibility that the jury would have convicted Appellant of the lesser offense of second-degree assault, knowingly causing or attempting to cause serious physical injury to another person under the influence of sudden passion arising out of adequate cause.

The State contends that if this Court finds error, the remedy here should be a retrial for assault I and II, without the option of acquitting. This defies the basic concept of American and English jurisprudence: the presumption of the innocence of every person charged with a crime. This is not a procedural presumption, but substantive, and there is no exception. "No case is ever submitted, none could lawfully be submitted, without a charge that the defendant in law [is] presumed to be innocent and the state must prove his guilt beyond a reasonable doubt before he

11

can be found guilty." State v. Barton, 236 S.W.2d 596, 602 (Mo. banc 1951) (Hollingsworth, concurring).  We decline to ignore this guaranty.

Appellant's second point is granted.  We reverse Appellant's conviction of Count I, first-degree assault.  Because that conviction was the basis for Count II, armed criminal action, Count II is also reversed.  The cause is remanded for a new trial on Counts I and II.

### Point I:  Instructional Error for Assault as a Single or Multiple Acts

Next, we discuss Appellant's first point, which alleges the trial court plainly erred in submitting Instruction No. 9 to the jury because the verdict director failed to specify a particular incident of assault in the first degree while the State presented multiple, distinct acts of assault. Appellant alleges the verdict director made it unclear as to which incident he was found guilty and allowed the possibility that the jurors failed to find the same incident of assault in the first degree unanimously.

A.  Standard of Review

Appellant failed to object to the verdict directors about which he now complains, and thus requests plain error review pursuant to Rule 30.20.  A request for plain error review triggers the commencement of a two-step analysis by an appellate court.  State v. Campbell, 122 S.W.3d 736, 740 (Mo. App. S.D. 2004).  The first step of this analysis is to determine whether the asserted claim of plain error facially establishes substantial grounds for believing a manifest injustice or miscarriage of justice has occurred.  Id.  If facially substantial grounds are found to exist, the appellate court should secondly engage in plain error review to determine whether a manifest injustice or a miscarriage of justice has actually occurred.  Id.  If facially substantial grounds are not found to exist, however, the appellate court should decline to exercise its discretion to review the claim of plain error pursuant to Rule 30.20.  Id.  To find manifest

injustice, this Court must find that the trial court's error in admitting the evidence was outcome determinative.  State v. Baxter, 204 S.W.3d 650, 652 (Mo. banc 2006).

Whether a jury was instructed properly is a question of law this Court reviews *de novo*. Hervey v. Missouri Dept. of Corrections, 379 S.W.3d 156, 159 (Mo. banc 2012).  Review is conducted in the light most favorable to the record, and, if the instruction is supported by any theory, its submission is proper.  Id.  To reverse on grounds of instructional error, the party claiming the error must establish that the instruction at issue misdirected, mislead, or confused the jury.  Additionally, prejudice must have resulted from the instructional error.  Sorrell v. Norfolk S. Ry. Co., 249 S.W.3d 207, 209 (Mo. banc 2008).

B.  Analysis

Article I, Section 22(a) of the Missouri Constitution protects the right to a unanimous jury verdict.  State v. Celis-Garcia, 344 S.W.3d 150, 154 (Mo. banc 2011).  "For a jury verdict to be unanimous, the jurors must be in substantial agreement as to the defendant's acts, as a preliminary step to determining guilt."  Id. (internal citations and quotation omitted).  "The issue of jury unanimity may be implicated in cases . . . commonly referred to as 'multiple acts' cases." Id.  "A multiple acts case arises when there is evidence of multiple, distinct criminal acts, each of which could serve as the basis for a criminal charge, but the defendant is charged with those acts in a single count."  Id. at 155-56 (internal citations omitted).

The Celis-Garcia court gave an example of a multiple acts case by citing State v. Washington, 146 S.W. 1164 (Mo. 1912), in which the defendant was charged with one count of the felony of setting up a gambling device, but evidence was presented of two gambling tables and the instruction did not specify which gaming table was at issue.  Id.  The Missouri Supreme Court reversed the conviction based on the holding that some jurors may have convicted the defendant for one table and other jurors may have convicted the defendant for the other table.  Id.

13

at 1166.  We distinguish <u>Washington</u> from the case at hand because we find the three shots fired were part of a continuing course of conduct rather than three separate assaults.  "In assault cases, separate offenses can arise from a single set of facts each time the defendant forms an intent to attack the victim."  <u>State v. Garnett</u>, 298 S.W.3d 919, 923 (Mo. App. E.D. 2009).  "Thus, when a defendant has time to reconsider his actions, 'each assault separated by time' constitutes a separate offense."  <u>Id.</u> (quoting <u>State v. Harris</u>, 243 S.W.3d 508, 511 (Mo. App. W.D. 2008)).  "Factors such as time, place of commission, and the defendant's intent, as evidenced by his conduct and utterances determine whether separate offenses should result from a single incident."  <u>Id.</u>  Courts also consider whether there is a causal relationship between the acts, in particular whether there was an intervening event, and whether there is a fresh impulse motivating some of the conduct.  <u>Celis-Garcia</u>, 344 S.W.3d at 156.

Here, Instruction No. 9 read as follows:

As to Count I, if you find and believe from the evidence beyond a reasonable doubt:
That on or about September 16, 2016, in the County of St. Charles, State of Missouri, the defendant attempted to kill or cause serious physical injury to Lawrence Cunningham a/k/a "Red" by shooting at him with a firearm,
then you will find the defendant guilty under Count I of assault in the first degree.
However, unless you find and believe from the evidence beyond a reasonable doubt each and all of these propositions, you must find the defendant not guilty of that offense.
As used in this instruction, a person attempts to kill or cause serious physical injury when, with the purpose of causing that result, he does any act that is a substantial step toward causing the result.  A "substantial step" is conduct that is strongly corroborative of the firmness of the actor's purpose to cause that result.  It is no defense that, under the circumstances, it was impossible to achieve that result, if such result could have been achieved had the circumstances been as the person believed them to be.
As used in this instruction, the term "serious physical injury" means physical injury that creates a substantial risk of death or that causes serious disfigurement or protracted loss or impairment of the function of any part of the body.
MAI-CR 319.08
Submitted by the State

14

We first determine whether the asserted claim of plain error facially establishes substantial grounds for believing a manifest injustice or miscarriage of justice has occurred. The evidence presented at trial showed that Appellant saw Red peek out of the bathroom after showering with Girlfriend, and then Appellant walked down the hallway with a gun in his hand and told Red he was going to kill him. Red grabbed Appellant's arm and moved it away from his body while Appellant attempted to aim the gun at Red's head. Appellant fired three shots and continued to attempt to fire the gun even after no live rounds remained. Appellant concedes that the three shots were fired within a short period of time, and the evidence is clear that they were all fired within the bathroom of the trailer. Despite Appellant's attempt to argue he had the opportunity to reconsider his actions based on Red's attempts to convince him not to shoot, there is no evidence that a "fresh impulse" motivated each shot. We find Appellant's attack on Red was one continuous assault rather than three separate assaults. See State v. Gilbert, 531 S.W.3d 94, 102 (Mo. App. W.D. 2017) (finding that any alleged instructional error could not have affected the verdict where multiple acts occurred during a single, uninterrupted pursuit and defendant asserted a general denial defense).

Furthermore, "[a] jury need only be unanimous as to the ultimate issue of guilt or innocence, and need not be unanimous as to the means by which the crime was committed." State v. Richter, 504 S.W.3d 205, 211 (Mo. App. W.D. 2016). The source of the substantive law in this case is the statute for assault in the first degree. That statute states, "A person commits the crime of assault in the first degree if he attempts to kill or . . . attempts to cause serious physical injury to another person." Section 565.050.1. Thus, the jury needed to unanimously agree only on the fact that Appellant attempted to kill or cause serious physical injury to Red, and not on the means by which he did so. Whereas Instruction No. 9 was supported by the evidence and did not misdirect, mislead, or confuse the jury, we find no grounds for believing a

15

manifest injustice or miscarriage of justice has occurred and thus, the trial court did not plainly err in submitting the instruction.  Appellant's first point is denied.

## Point VI:  Instructional Error for Endangering the Welfare of a Child

Similar to Point I, Appellant argues in Point VI that the trial court plainly erred in submitting Instructions 37, 41, 45, 49, and 53, because the verdict directors failed to specify a particular incident of endangering the welfare of a child in the second degree as to S.W., M.W., A.W., T.W. and W.W., and thereby violated Appellant's rights to due process, a fair trial, and a unanimous verdict.  Appellant alleges the State presented evidence of multiple acts of shooting a firearm in the home the children were located, yet the verdict director did not specify any one of these incidents, thereby making it unclear as to which incident Appellant was found guilty and allowing the possibility that the jurors failed to find the children were endangered by the same shot unanimously.

A.  Standard of Review

Appellant failed to object to the verdict directors about which he now complains.  In fact, the transcript shows that Appellant offered Instructions No. 37, 41, 45, 49, and 53, the verdict directors for the offenses of second-degree endangering the welfare of a child as to Counts X-XIV, which the trial court agreed to submit to the jury with no objection by the State or Appellant.  Appellant also failed to raise this issue in his motion for new trial.  Appellant requests plain error pursuant to Rule 30.20, which we have discussed in Point I, <u>supra</u>.

B.  Analysis

Just as Appellant argued in Point I, he argues again in Point VI that although the jury heard evidence of multiple acts of shots being fired in the house where the children were present, it was not told which incident to consider as the actual charged crime in endangering the welfare

16

of a child in the second degree. He argues that there is no assurance that all jurors agreed that

Appellant committed the same acts of endangering the welfare of a child in the second degree.

The jury received the following verdict director, which corresponded to the count

charged:

Instruction No. [37], [41], [45], [49], [53]

As to Count [10], [11], [12], [13], [14], if you find and believe from the evidence beyond a reasonable doubt:
First, that on or about September 16, 2016, in the County of St. Charles, State of Missouri, the defendant was shooting a firearm in the home in which the child was located, and
Second, that in doing so, the defendant created a substantial risk to the life or body or health of [S.W.], [M.W.], [A.W.], [T.W.], [W.W.], and
Third, that [S.W.], [M.W.], [A.W.], [T.W.], [W.W.] was then less than seventeen years of age, and
Fourth, that defendant acted with criminal negligence in creating a substantial risk to the life or body or health of a child under seventeen years of age, then you will find the defendant guilty under Count [10], [11], [12], [13], [14] of endangering the welfare of a child in the second degree.
However, unless you find and believe from the evidence beyond a reasonable doubt each and all of these propositions, you must find the defendant not guilty of that offense.
As used in this instruction, the term "acted with criminal negligence" means that one fails to be aware of a substantial and unjustifiable risk that circumstances exist or a result will follow, and such failure constitutes a gross deviation from the standard of care that a reasonable person would exercise in the situation.

MAI-CR3d 322.11
Submitted by Defendant

The source of the substantive law in this case is the statute for endangering the welfare of

a child in the second degree. "A person commits the crime of endangering the welfare of a child

in the second degree if . . . [h]e or she with criminal negligence acts in a manner that creates a

substantial risk to the life, body or health of a child less than seventeen years old." Section

568.050.1(1), RSMo Supp. 2005. Here, evidence was presented that Appellant created a

substantial risk of harm to the children present in the home by angrily shooting a firearm in a

17

drunken state while inside the trailer home. The risk was not tied to a particular shot, but rather to Appellant's continuing course of conduct in his criminally negligent handling of the firearm. Just as we discussed, supra, in Point I, the shots fired by Appellant occurred within a matter of minutes and within the same trailer while the children were present. All of the shots were motivated by the same thing: Appellant's anger resulting from Girlfriend showering with Red. The instructions properly referred to Appellant's continuing course of conduct of shooting a firearm in the home in which the children were present. Instructions No. 37, 41, 45, 49, and 53 were supported by the evidence and did not misdirect, mislead, or confuse the jury. Accordingly, we find no grounds for believing a manifest injustice or miscarriage of justice has occurred and the trial court did not plainly err in submitting the instruction. Point VI is denied.

### Point III: Sufficiency of the Evidence of Endangering A.R.

In his third point, Appellant alleges the trial court erred in denying his motions for judgment of acquittal because there was insufficient evidence from which a reasonable juror could have found Appellant created a substantial risk to the life, body, or health of A.R.

A. Standard of Review

Our review of the sufficiency of the evidence is limited to whether the State has introduced sufficient evidence from which a reasonable juror could have found each element of the crime beyond a reasonable doubt. State v. Hunt, 451 S.W.3d 251, 257 (Mo. banc 2014). This Court does not reweigh the evidence, but rather considers it in the light most favorable to the verdict and grants the State all reasonable inferences. Id. Contrary evidence and inferences are disregarded. Id. The Court may not supply missing evidence or give the State the benefit of unreasonable, speculative, or forced inferences. State v. Langdon, 110 S.W.3d 807, 811-12 (Mo. banc 2003).

18

B.  Analysis

"A person commits the crime of endangering the welfare of a child in the first degree if . . . [t]he person knowingly acts in a manner that creates a substantial risk to the life, body or health of a child less than seventeen years old." Section 568.045.1, RSMo Cum. Supp. 2009. "'[R]isk' is defined as 'the possibility of loss, injury, disadvantage, or destruction.'" State v. Todd, 183 S.W.3d 273, 278 (Mo. App. W.D. 2005) (quoting State v. Brock, 113 S.W.3d 227, 323-33 (Mo. App. E.D. 2003)). "A substantial risk is an actual or 'practically certain' risk." State v. Harding, 528 S.W.3d 362, 374 (Mo. App. E.D. 2017) (quoting State v. Smith, 241 S.W.3d 442, 445 (Mo. App. W.D. 2007)). "[A] substantial risk may exist even though the risk does not materialize into actual harm." Todd, 183 S.W.3d at 278. "[T]he plain and ordinary meaning of 'health' is broad enough to encompass a person's mental, emotional or psychological condition." State v. Loughridge, 395 S.W.3d 605, 609 (Mo. App. S.D. 2013). Therefore, "evidence that a defendant's conduct caused a substantial risk to a child's emotional health would be sufficient to support a conviction for [child endangerment]." Id. at 610.

The evidence showed that A.R. was present when Appellant fired his gun in the living room. A.R. testified that after hearing what he thought was a loud gunshot, he left his bedroom and went into the living room, at which point he saw Appellant pointing a gun at his brother, M.R. A.R. testified that he was standing right next to M.R. while Appellant pointed a gun at M.R.'s chest from about five feet away. A.R. said he "ran out the front door" to a neighbor's house and asked them to call the police; he waited at the neighbor's house until the police responded and escorted him back to his house. Additionally, J.R. testified that he heard their mother screaming, "[P]lease don't kill me," and that the first gunshot frightened him while he was in the same bedroom as A.R. J.R. said that Appellant began shooting the firearm at J.R., M.R., and A.R., as they fled from the living room.

19

Appellant argues there was no evidence that A.R.'s life or body was in any risk, much less a substantial one by the firing of the single shot fired into the ceiling of the living room. He points out that the other three shots were fired after A.R. had already left the trailer and so he could not have been at any risk then either. However, in viewing the evidence in the light most favorable to the verdict, we find there was sufficient evidence from which a reasonable juror could have found that A.R.'s life, body, or health was at substantial risk when Appellant shot a firearm in the home and when he pointed the gun at his brother, M.R., from about five feet away in a drunken state of being. The evidence was sufficient to demonstrate to a reasonable juror that A.R. was within the "zone of danger" when the first shot was fired, as well as when Appellant was pointing a firearm around within very close proximity to A.R. This evidence was sufficient evidence from which a reasonable juror could have found that A.R.'s life or body was at substantial risk, either physically or mentally, emotionally or psychologically.

Therefore, the trial court did not err in denying Appellant's motions for judgment of acquittal for the crime of endangering the welfare of a child in the first degree regarding A.R. Appellant's third point is denied.

**Point IV: Sufficiency of the Evidence of Endangering S.W., M.W., A.W., T.W. and W.W.**

Appellant's fourth point alleges the trial court erred in denying his motions for judgment of acquittal because there was insufficient evidence from which a reasonable juror could have found that Appellant created a substantial risk to the life, body, or health of the five children, S.W., M.W., A.W., T.W. and W.W.

As discussed in Appellant's third point, supra, our review of the sufficiency of the evidence is whether the State has introduced sufficient evidence from which a reasonable juror could have found each element of the crime beyond a reasonable doubt. State v. Hunt, 451 S.W.3d 251, 257 (Mo. banc 2014). Also discussed in Appellant's third point, supra, the crime of

20

endangering the welfare of a child in the second degree is committed when the defendant acts with criminal negligence in a manner that creates a substantial risk to the life, body, or health of a child less than seventeen years old. Section 568.050.1(1).

Although Appellant argues the gunshots were nowhere near the children and that they were not in actual danger, we agree with the State in that there was sufficient evidence from which a reasonable juror could have found that Appellant created a substantial risk to the life, body, or health of S.W., M.W., A.W., T.W., and W.W. when he shot a firearm in the mobile home where the alleged crimes took place. The children were ages 10, 9, 8, 6 and 3 at the time of the incident, and even if a reasonable jury would not have found them at risk of physical danger, any reasonable jury certainly would find the children at risk mentally and emotionally.

Viewing the evidence in the light most favorable to the verdicts and disregarding contrary inferences, Appellant fired three shots from his revolver in the bathroom of the mobile home while Red struggled with Appellant to point the gun away from him. Two shots traveled through the bathroom wall and into the adjacent bedroom that belonged to two of the children, J.R. and A.R. One of the shots traveled through the bedroom ceiling while the other continued through the opposite wall of the bedroom and into the living room, where it then went through the ceiling. Although the bullets did not travel into the bedroom where the five youngest children were located, in a shared bedroom on the other end of the trailer, next to the laundry room, the jury still could have reasonably found that Appellant created a substantial risk to the life, body, or health of those children. Stray bullets traveling through walls in close quarters such as this mobile home, yelling, and firing shots while struggling and drunk were evidence enough of a risk of injury, both physical and emotional. Because the "substantial risk" required by the statute need not materialize into actual harm, we need not have proof of actual harm to the five children in order to say that the evidence was such that the risk was "practically certain" during the events

21

at issue.  See Todd, 183 S.W.3d at 278; Brock, 113 S.W.3d at 232-33.  A reasonable juror could find that the children were at substantial risk of physical harm of stray bullets.  A reasonable juror could also find that the children were at substantial risk of mental, emotional, or psychological harm from the screaming and yelling from Appellant and their mother about killing her, as well as the loud gunshots that scared them.  Several of the children testified that they heard the yelling and the gunshots and that they were scared as a result.  Additionally, when Girlfriend checked on the children after Appellant left, she found they were all crying.  Thus, there was sufficient evidence from which a reasonable juror could find that Appellant created a substantial risk of harm to the mental, emotional, or psychological health of the children here.

Accordingly, the trial court did not err in denying Appellant's motions for judgment of acquittal regarding the child endangerment in Counts X through XIV.  Point IV is denied.

### Point V:  Comfort Dog's Presence during Children's Testimony

In his fifth point, Appellant alleges the trial court abused its discretion in allowing Sully, a comfort dog from the prosecutor's office, to accompany T.W. and W.W. to the witness stand, because the trial court was without statutory authority to allow this and it violated Section 491.725.  Appellant argues the presence of a "comfort dog" created the impression to the jury that W.W. and T.W. had been traumatized by Appellant's alleged actions.  We disagree.

A.  Standard of Review

"The trial court has considerable discretion in matters regarding examination of witnesses.  The exercise of that discretion should not be disturbed on appeal unless it has been abused or substantial harm has been improperly done to the complaining party."  State v. Dickson, 337 S.W.3d 733, 743 (Mo. App. S.D. 2011) (internal citations omitted).  An abuse of discretion occurs when the trial court's ruling is clearly against the logic of the circumstances before the court at the time and is so unreasonable and arbitrary that it shocks one's sense of

22

justice and indicates a lack of careful consideration. Gallagher v. DaimlerChrysler Corp., 238 S.W.3d 157, 162 (Mo. App. E.D. 2007). "Whenever a courtroom arrangement is challenged as inherently prejudicial, the court must consider whether the practice presents an unacceptable risk that impermissible factors will come into play which might erode the presumption of innocence." State v. Gollaher, 905 S.W.2d 542, 546-47 (Mo. App. E.D. 1995). If the practice itself is not inherently prejudicial and no actual prejudice is demonstrated, then the trial court did not abuse its discretion. Id. Moreover, "[t]he trial court abuses its discretion if it fails to follow the applicable statutes." State ex rel. Washington Univ. v. Richardson, 396 S.W.3d 387, 391 (Mo. App. W.D. 2013) (citing State ex rel. City of Jennings v. Riley, 236 S.W.3d 630, 631 (Mo. banc 2007). We review issues involving interpretation of a statute de novo. State ex rel. Valentine v. Orr, 366 S.W.3d 534, 538 (Mo. banc 2012).

B. Analysis

The court's primary rule of statutory interpretation is to give effect to legislative intent as reflected in the plain language of the statute at issue. State ex rel. White Family P'ship v. Roldan, 271 S.W.3d 569, 572 (Mo. banc 2008). Other rules of statutory interpretation, which are diverse and sometimes conflict, are merely aids that allow this Court to ascertain the legislature's intended result. Edwards v. St. Louis County, 429 S.W.2d 718, 722 (Mo. banc 1968).

Section 491.725, known as the "Child Witness Protection Act," states, in relevant part:

3. In order to facilitate testimony that is fair and accurate, for the benefit of all parties, and in order to protect all parties from the risks of a child becoming confused while testifying in a judicial proceeding, the following child witness protection act shall apply to all children testifying in court:
(4) Upon motion made by the child, his or her representative, or any party to the judicial proceeding, at least thirty days in advance of the judicial proceeding, the court may allow the child to have a toy, blanket, or similar item in his or her possession while testifying, but such item shall only be allowed if:
    (a) All parties agree; or
    (b) If the movant shows the court by a preponderance of evidence that:
        a. The child in question cannot reliably testify without the item in his or her possession; and

23

>>b. Allowing the item is not likely to prejudice the trier of fact in hearing and evaluating the child's testimony[.]

Section 491.725.3(4).

The statute continues further:

>(5) Upon motion made by . . . any party to the judicial proceeding, . . . the court may designate a support person, who shall be present in the courtroom, in view of the child witness. The court may allow the support person to remain in close proximity to the child during the child's testimony, but such action shall only be allowed if:
>>(a) All parties agree; or
>>(b) If the movant shows the court by a preponderance of the evidence that:
>>>a. The child in question cannot reliably testify without the support person in close proximity during the testimony; and
>>>b. Allowing the support person to be in close proximity to the child during testimony is not likely to prejudice the trier of fact in hearing and evaluating the child's testimony.

Section 491.725.3(5).

Appellant argues that the dog should not have been allowed because a dog is not stated in the statute, the children testified in depositions just fine without the dog, and Appellant was prejudiced because having the dog present showed the children's mental health had been affected by Appellant's actions.

On February 4, 2018, the State filed a motion in limine to employ special procedures during the children's testimony, pursuant to Section 491.725. The motion does not mention a dog. On March 19, 2018, the day before trial, the trial court held a hearing on the State's motion in limine, and there, the State expressed its intention to have the dog, Sully, accompany the children while testifying. Appellant opposed this proposition, arguing that a dog was not stated in the statute, the children testified in depositions without the dog just fine, and that Appellant would be prejudiced by the dog because it would show the children's mental health had been affected by Appellant's alleged actions. An older sister ("Sister") testified at the hearing that she believed her younger siblings would "need Sully, the comfort dog." She said "[i]t [would] help

24

comfort them, . . . make it easier for them to be able to talk and make them not as scared, maybe a little less timid." Sister said that the comfort dog's presence would result in making the children's testimony more accurate and reliable because "it [would] help them focus," as they were comfortable around dogs. Sister said the children had asked for the dog's presence during their testimony and she thought they would be too nervous and scared without him. The State proposed that Appellant could proffer jury instructions that instruct the jury not to infer the children are more credible because of the dog. Further, the State argued that testifying in court would be different than in deposition because Appellant would be present. Despite Appellant's objection, the trial court ruled that the dog fell "within the spirit of the statute" and that comfort animals were being used in other places and that Appellant would not be prejudiced.

Without deciding the applicability of Section 491.725, the Western District has decided similar cases with regard to the use of "comfort items." In State v. Hartman, Hartman argued that the cumulative effect of the presence of Bikers Against Child Abuse ("BACA") members around the children prior to trial, in addition to the children wearing BACA vests while testifying, was inherently prejudicial and deprived him of the right to a fair trial. 479 S.W.3d 692, 704-05 (Mo. App. W.D. 2015). The court used persuasive authority to weigh the beneficial effects of such comfort items against potential prejudice. Id. at 705. The appellate court noted that children were allowed to wear vests while testifying because the victims felt supported by BACA, there was no indication that any effort was made to focus attention on the vests, and use of the vests was not calculated to elicit emotional sympathy from the jury. Id. The court did not find the trial court abused its discretion in allowing the victims to wear the vests as it was "extremely diligent and successful in ensuring that there was no unacceptable risk that impermissible factors influenced the jury." Id.

A similar case is State v. Powell. 318 S.W.3d 297 (Mo. App. W.D. 2010). Powell was decided when the statute was not yet in effect, but the defendant argued the trial court abused its discretion in overruling his objection to child victims holding teddy bears during trial testimony. Id. at 302. The court considered cases from other jurisdictions and found persuasive their practice of weighing the beneficial effects of such comfort items against potential prejudice. Id. at 303. The Powell court found the trial court considered the usefulness of the items against the possibility of prejudice and determined that the items were a source of familiarity and comfort, and there was nothing to suggest the items were used in an attempt to elicit emotional sympathy from the jury. Id. The court found no abuse of discretion in overruling the defendant's objection to the items. Id. at 304.

Based on the language of the statute as well as the previous case law that set out to solve the same issue that the trial court faced here, we find the explicit intent of Section 491.725 is to "facilitate testimony that is fair and accurate, for the benefit of all parties, and in order to protect all parties from the risks of a child becoming confused while testifying in a judicial proceeding." Section 491.725.3. Moreover, as previous courts have done, the statute attempts to weigh the beneficial effects of such comfort items that help the child testify against the potential prejudice of having the items in court. Thus, we agree with the State in that the statutory language permitting the use of "a toy, blanket, or similar item," without defining "similar item," is properly read as being intended to permit the use of something with a comforting effect on the child in order to produce reliable testimony. The statute even expressly authorizes the use of a "support person" in Section 491.725.3(5) to further support the conclusion that the legislature did not intend to limit attempts to comfort a testifying child to the strict use of nonliving objects. The trial court did not err in finding that a comfort dog was authorized by Section 491.725.

26

Further, the trial court did not abuse its discretion in finding the dog's presence would not be prejudicial to Appellant. The record does not provide evidence of the dog's visibility or prejudice other than a reference that "Sully was in for the last children and there was [sic] no disruptions. The other two children did not need him and so . . . [the prosecutor] did not bring him in." This demonstrates that the dog was utilized only where necessary, during testimony of two of the seven children, and we find no other evidence that the dog was an attempt to appeal to the emotional sympathy of the jurors. The trial court heard argument on why the dog was needed and heard Appellant's objections to the same. The court ruled to allow the dog, which is not an arbitrary or unreasonable ruling that shocks one's sense of justice and indicates a lack of careful consideration. Appellant's fifth point is denied.

### III. Conclusion

The judgment of the trial court is reversed and the case is remanded for a new trial on Counts I and II. All remaining counts are affirmed.

_____
ROY L. RICHTER, Judge

Robert M. Clayton III, P.J., concurs
Robert G. Dowd, Jr., J., concurs

27